O’BRIEN, Circuit Judge,
dissenting.
The Majority brands Melinda Sneddon, Shirley Morrison and Colleen Lasater (“social workers”) as purely incompetent or willful violators of the law.[1] Strong stuff! Particularly strong because the Majority opinion allows no room for a simple error or a principled difference of opinion. It necessarily means that any competent social worker in similar circumstances could only arrive at two distinct conclusions: 1) if Rusty was left at home, services adequate to meet his needs would be accepted and could be provided in that environment, and 2) such services were reasonably available. The Majority says the social workers unreasonably chose removal after learning, in the chaos of the moment, that Rusty’s alleged primary care physician believed removal may harm Rusty and his family. In so holding, it necessarily concludes the only reasonable course was for the social workers to disregard reports of Rusty’s seriously deteriorating condition and the concerns of three physicians in order to pursue preventive services. In one respect I agree with the Majority. The social workers could reasonably believe at all relevant times that Utah Code Ann. §§ 62A-4a-202.1 and 202.2 were current, constitutional and specifically authorized the removal of a child without a warrant. However, I must respectfully disagree with its conclusion that the social workers did not comply with the mandates of § 62A-4a-202.1(2)(b) by failing to offer preventive services in lieu of removal and therefore are not entitled to qualified immunity.[2]
The key issue on appeal is whether the social workers in fact complied with the statute when they did not offer preventive services prior to or in lieu of removal. Here, the statute requiring preventive services specifically provided:
(b) If possible, consistent with the child’s safety and welfare, before taking a child into protective custody, the worker shall also determine whether there are services reasonably available to the worker which, if provided to the minor’s parent or to the minor, would eliminate the need to remove the minor from the custody of his parent in accordance with the provisions and limitations of Section 78-8a-301. If those services are reasonably available, they shall be utilized. In determining whether services are reasonably available, and in making reasonable efforts to provide those services, the child’s health, safety, and welfare *980 shall be the worker’s paramount concern.[3]
Utah Code Ann. § 62A-4a-202.1(2)(b) (1998) (emphasis added). The term “reasonable” or “reasonably” is used no less than four times. As a result, we must determine whether the social workers’ judgement that there were no reasonably available preventive services that would eliminate the need to remove Rusty and secure his health, safety and welfare was a reasonable decision for a competent professional. If so, the social workers are entitled to qualified immunity. As a guide to our inquiry, we must remember the statute required the child’s health, safety and welfare to be the deciding factor. In addition, as in all reasonableness determinations, the “touchstone” of our inquiry is the “totality of the circumstances.” Phillips v. James, 422 F.3d 1075, 1080 (10th Cir.2005).
Thus, a pivotal point in this case is the nature of the suspected abuse facing these professionals. Here, there were reasonable suspicions that Rusty’s serious condition was the product of “Munchausen syndrome by proxy (MSBP),” also known as “[factitious disorder by proxy” (FDP).[4] Lynne Holland Goldman & Beatrice Crofts Yorker, Mommie Dearest? Prosecuting Cases of Munchausen Syndrome by Proxy, 13-WTR Crim. Just. 26, 27 (Winter 1999).[5] Commentators identify MSBP by four elements: “(1) a child’s illness is induced by a parental figure; (2) a parent repeatedly seeks medical examination and care of the child; (3) the parent denies any knowledge of the progress of the illness; and, (4) the symptoms quickly cease when the child and the parent are formally separated.” Susan L. Pollet, Outside Counsel Column “Munchausen Syndrome By Proxy — A Horror Story Come Real’’, 30 Westchester B.J. 33, 34 (Spring 2003) (quotations omitted). “Medical professionals become the unwitting puppets of a mother with MSBP....” E. Selene Steel-man, A Question of Revenge: Munchau-sen Syndrome By Proxy and a Proposed Diminished Capacity Defense for Homicidal Mothers, 8 Cardozo Women’s L.J. 261, 269 (2002). The victims are subjected to “unnecessary procedures and tests” as well as “frequent and prolonged hospitalizations that ... interfere with normal peer relationships and contribute to the child’s self-concept as a chronically ill patient.” Id.; Beatrice Crofts Yorker, Court Video Surveillance of Munchausen Syndrome By Proxy: The Exigent Circumstances Exception, 5 Health Matrix: J. of L. Med. 325, 327 (Summer 1995). “The repetitive, compulsive nature of MSBP and the high mortality rate make this one of the more dangerous forms of abuse.” Lynne Holland Goldman & Beatrice Crofts Yorker, supra, at 29.
The authors of Munchausen by Proxy: Child Abuse in the Medical System sum up the problems faced by the medical *981 community in recognizing this often baffling form of child abuse:
Munchausen Syndrome by Proxy therefore evolves as a product of the relationship between a parent who has both the capacity for abuse and the potential to be gratified by the medical system and a medical system that is specialized, investigation-oriented, fascinated by rare conditions, often ignorant of abusive behaviors, and too accepting of reported histories.
Suzanne Painter Mochow, Munchausen Syndrome By Proxy: A Subtle Form, of Child Abuse and a Potential Due Process Nightmare, 18 J. Juv. L. 167, 169 (1997) (quoting Terence Donald, Jon Jureidine & Catherine D. DeAngelis, Munchausen Syndrome by Proxy: Child Abuse in the Medical System, 150 Archives of Pediatric & Adolescent Medicine, July 1996, at 753).
Against this backdrop, we consider the information available to the social workers when they determined to remove Rusty from his home without first offering preventive services. Despite the Majority’s cavalier treatment of the school personnel’s accounts, there is no question that an urgent concern for Rusty’s welfare motivated the report to DCFS.[6] School personnel, including school nurses, informed Ms. Sneddon that Rusty’s condition was drastically deteriorating. That fact, coupled with Mrs. Roska’s alarming reports of Rusty’s condition and diseases, led them to believe the Roskas were either facilitating or improperly addressing Rusty’s alleged distress. Indeed, the school employees were concerned that, in a matter of months, Rusty may die if he remained in his home. This concern was not misplaced. MSBP is “a form of child abuse with a substantial risk of morbidity and even mortality.” In re McCabe, 157 N.C.App. 673, 580 S.E.2d 69, 73 (2003). In addition, the records obtained by DCFS included Wilson’s handwritten notes in October 1998, approximately a month prior to his visit to UCLA Children’s Hospital Pain Clinic. These records contain notations such as “10/191798] ... Tub of puk[e] or something on bed. Bloody Kleenex’s [sic] on s[h]elves.” and “10/27 ... Tub with puk[e] & Kleenexs [sic] still on bed.” (App. Vol. II at 373-74.)
The social workers were also aware of two earlier investigations into suspicions of MSBP in 1998, one conducted by Primary *982 Children’s Medical Center and one conducted by DCFS based on a former treating physician’s report.[7] When informed by Ms. Morrison that MSBP was suspected, both Dr. Joseph, Rusty’s physician at UCLA, and Dr. Evans, listed as Rusty’s primary physician on his school emergency contact form, expressed their own substantial concerns.[8] Further, Ms. Morrison knew that Dr. Bursch, also from UCLA, suspected MSBP.
Dr. Joseph explained that while Rusty was treated as an in-patient at UCLA, he made substantial progress. Within ten days after Rusty’s arrival at UCLA, “Rusty was newly able to stand, walk up to 40 feet, crawl 20 feet, propel his wheelchair around the hospital and surrounding hospital grounds, walk up/down three stairs and get in and out of a very tall bathtub.” (Id. at 574.) Rusty’s prognosis was near full recovery within “1-4 months” with proper follow-up treatment.[9] (Id.) However, his rehabilitation program, normally a three-month stay, was prematurely discontinued after three weeks at the insistence of the family. In addition, Ms. Morrison learned the doctors had recommended psychological treatment and avoidance of medical procedures. However, Mrs. Roska had strongly resisted a psychological diagnosis. After Rusty was released from in-patient treatment at UCLA in December, his condition clearly deteriorated in his parents’ care.
Although Ms. Morrison was unable to speak immediately with Dr. Gooch, an appointment was made to discuss the case at a later date. The social workers then consulted with counsel who advised them that the circumstances met the statutory requirements for immediate removal. As a result, Rusty’s intervention proceeded.
The events in the home during Rusty’s removal are decidedly disputed. However, all would agree the scene was chaotic after Mrs. Roska was told that Rusty would be removed. In the midst of the commotion, either Mr. or Mrs. Roska telephoned Dr. Gooch, who called back while the removal was in progress. Eventually, Dr. Gooch spoke with Ms. Sneddon.[10] Dr. Gooch *983 strongly advised against removal. However, when told of the concerns of Dr. Joseph and Dr. Evans, she refused to confirm or deny any suspicions of MSBP. After Ms. Sneddon consulted with her supervisor, Ms. Lasater, Rusty’s removal from the home was completed.
The social workers claim their decision to forego preventive services was reasonable under the circumstances of this case due to a confluence of several factors. First, they reasonably believed the family’s history indicated voluntary compliance with preventive measures would not be forthcoming. The Majority rejects this argument for two reasons — DCFS services had not been offered in the past and the failure to comply with the UCLA treatment plan was not indicative of noncompliance with DCFS. Both reasons are unpersuasive. Although DCFS had not offered preventive services in the past, they had conducted an investigation into a report of MSBP. The Roskas had not been cooperative.[11] In Morrison’s case notes she also reiterates entries by the Davis County Health workers in 1998 that stated Mrs. Roska was reluctant to allow them visitation and had complained “there were too many people coming in and passing judgment without knowing what was going on.” (App. Vol. II at 606.) In addition, Morrison’s notes reflect Mrs. Roska told the nurse that “ ‘they’ wanted to put [Rusty] in a psychiatric facility but [Mrs. Roska] is totally opposed to that.” (Id.) Mrs. Roska’s resistance to psychiatric treatment for Rusty was also documented in other instances.
Further, I question the Majority’s insistence that prior failures to follow through were not relevant to a reasonable assessment of likely future behavior. Especially puzzling is the Majority’s speculation that the dire consequences of failing to comply with DCFS services would somehow motivate the family to accept and comply with preventive services before removal was necessary. The same consequences (possible removal and permanent loss of custody) existed when they failed to cooperate with the earlier investigation. More importantly, it is difficult to imagine a parental motivation more compelling then complying with a treatment plan that results in the child’s ability to walk, eat and otherwise have a normal life. Thus, the failure to comply with the UCLA plan, the only plan that had to that time resulted in improvement during the time Rusty was an in-patient, would surely be predictive of whether the Roskas would accept or comply with DCFS preventive measures. Dr. Gooch’s statement that Mrs. Roska “was doing a better job of keeping her appointments” does not undermine the reasonableness of the belief that Rusty’s parents would not accept or comply with services.[12]
*984 The Majority’s holding, however, relies almost exclusively on the fact that Dr. Gooch told Ms. Sneddon, after Mrs. Roska was told they were removing Rusty, that removal would destroy “all the progress [Mother] is making as far as making it to appointments etc. She also stated that we are destroying this family emotionally and Rusty may not recover.”[13] (App. Vol. Ill at 718; Vol. II at 611.) The Majority concludes this opinion made it “unreasonable for [the social workers] not to inquire further ... while they had Dr. Gooch on the telephone.” We must remember, the social workers were aware that when MSBP is present, the perpetrator’s objective is to retain a doctor that will buy-in to the facade. Thus, the failure to be assured of Rusty’s safety due to a single physician’s opinion contradicting the substantial concerns of three other physicians, particularly when the long dissenter refuses to comment on the likelihood of MSBP, is not unreasonable.[14] See Lynne Holland Goldman & Beatrice Crofts Yorker, supra, at 29 (“[P]erpetrators not only deceive the medical community by fabricating the illness, but these perpetrators are very manipulative and convincing.”). This is not a case where the social workers relied on third-hand reports from neighbors. Dr. Evans was named as Rusty’s primary physician on school documents and the UCLA Discharge Plan and had recently seen Rusty. He expressed substantial concern. Dr. Joseph had significant contact with the family only six months earlier. Dr. Bursch is a known authority on MSBP and had also had substantial contact with the family. As Dr. Bursch stated in her report, “At the time of the DCFS removal the overall backdrop of information represented a compelling picture of possible [MSBP] or related form of medical abuse.” (App. Vol. II at 430.) “It is completely illogical to [] rely solely on the doctors suspected of being fooled [i.e., Dr. Gooch] to give advice about medical status or safety.” (Id. at 433.) Further, the very people we rely on to assist in the identification of our children’s needs, school personnel, brought the complaint. In light of all these circumstances, a child protective system is a gossamer fabric if a reasonable decision to forego preventive services is rendered unreasonable at the moment a treating physician objects to removal and equivocally responds to the suspected cause of abuse.
The Majority next rejects the social workers’ belief that it would have been difficult to devise appropriate services because the source of Rusty’s ailments was unknown. That is so, it says, because the social workers reached that conclusion without talking to Dr. Gooch and because the treatment plan developed for Rusty at the UCLA Pain Clinic had proven effective in the past. As discussed above, the social workers reasonably believed they had *985 talked with Rusty’s primary physician. As to the UCLA plan, the Majority places the social workers between the proverbial rock and hard place. First, it determines that the Roska’s failure to comply with the UCLA treatment plan is not indicative of their likely failure to comply with DCFS preventive services. Then it suggests DCFS should have applied the treatment plan developed for Rusty at UCLA — the very treatment plan the Roskas failed to comply with in the first place. It ignores the fact that the plan was successful only while Rusty was an in-patient.
The Majority then discounts the social workers’ argument that allegations of Rusty’s parents contributing to or facilitating his illness made it unlikely that preventive services would be successful. It does so because suspicion of MSBP could not be substantiated. It concludes DCFS should have made services available and if the Roskas rejected the services or failed to comply, or if DCFS’s further supervision revealed additional evidence of MSBP, DCFS could then remove Rusty. But, the prior lack of substantiation does not mean Roskas had been exonerated. As Ms. Morrison explained, “[tjhere is a difference between without merit and unsubstantiated. Unsubstantiated means we don’t have enough evidence to say that this happened. But it may have happened. We just don’t have enough evidence to say it did.” (App. Vol. II at 415.) In any event, the unsubstantiated charges have little or nothing to do with the reasonable availability of preventive services except to underscore the difficulty of devising services for an unknown causation. In addition, the statute requires the “worker [to] determine whether there are services reasonably available to the worker which, if provided to the minor’s parent or to the minor, would eliminate the need to remove the minor from the custody of his parent....” Utah Code Ann. § 62A-4a-202.1(2)(b) (1998) (emphasis added). Application of preventive services to see if they might work is not a statutory duty.
The question here is whether it was reasonable for these social workers, under these conditions, to determine that preventive services sufficient to meet Rusty’s “health, safety, and welfare” needs were not reasonably available. Since the suspicions of MSBP were well-documented, if they proved to be true, Rusty’s health, safety and welfare were undeniably at risk on a daily basis.[15] The Majority asserts that a panel of this Court decided no emergency circumstances existed to justify removal without due process because Rusty’s health and safety were not in immediate danger and therefore, this issue has been decided. Roska I, 328 F.3d at 1250. Had the issue been decided, there would be no need for this appeal.
The Majority confuses the discussion regarding whether the law was clearly established, i.e., the necessity of “emergency circumstances which pose an immediate threat to the safety of a child,” Roska I, 328 F.3d at 1245, citing Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir.1997), to justify the absence of pre-deprivation procedures, and the question whether the social workers complied with the statute. The statute requires the offer of services if they are reasonably available and will eliminate the need for removal with the paramount consideration being Rusty’s health safety and welfare. Putting aside what process was due, our concern here is the reasonableness of the conclusion, made under stressful and uncertain circumstances, that preventive services adequate to eliminate the need for removal were *986 available. Therefore, our determination in the context of the Roskas’ Fourth Amendment claim is equally relevant. There, we affirmed the district court’s conclusion that, “an objective, reasonable state social worker could have reasonably believed, based on the information the DCFS defendants possessed at the time of removal, that there was substantial cause to believe that there was a substantial danger to Rusty’s health or safety and that Rusty’s health or safety could not be protected without removing him from his parents’ custody” and “there was substantial cause to believe that Rusty’s presence in his own home was the reason for his particularly troubling and persistent condition of being restrained to a wheelchair and having to be fed through an intravenous tube even though he was not physically handicapped.” Roska, I, 328 F.3d at 1250 (emphasis omitted).
The Majority ignores the social workers’ belief that confronting Mrs. Roska to offer preventive services might put Rusty in greater danger. Dr. Gooch’s opinion was rendered only after Mrs. Roska was told Rusty would be removed from the home. Without any prior indication that preventive services may be warranted, even if they had stopped to discuss preventive services, the social workers’ continued fear that Rusty would be put in greater danger was patently reasonable. See Lynne Holland Goldman & Beatrice Crofts Yorker, supra, at 29 (“[MSBP perpetrators] often become more dangerous when confronted with the possibility that they are causing the child’s condition of MSBP, and step up their fabrications in order to prove the doctors wrong.”); Melissa A. Prentice, Prosecuting Mothers Who Maim and Kill: The Profile of Munchausen Syndrome By Proxy Litigation in the Late 1990s, 28 Am. J.Crim. L. 373, 395 (Summer 2001) (“A mother is likely, when confronted, to escalate the child’s symptoms to reinforce to doctors the seriousness of the child’s illness ....”) (quotations omitted); E. Sel-ene Steelman, supra, at 272 (evidence of MSBP must be “assessed with prudence before confronting the mother so as not to provoke a defensive action that may subject the child to further harm.... ”). Finally, the failure to establish MSBP in the two earlier investigations is not uncommon. “In a 1993 study conducted by Herbert Schreier and Judith Libow (HURTING FOR LOVE: MUNCHAUSEN BY PROXY SYNDROME (New York: Guil-ford Press)), it took more than six months to diagnose MSBP in 33 percent of the cases; in 19 percent of the cases it took more than a year.” Lynne Holland Goldman & Beatrice Crofts Yorker, supra, at 29.
The Majority’s observation that the timing of the conversation with Dr. Gooch rests squarely on the social workers’ shoulders is unwarranted. As far as they knew, they had contacted Rusty’s primary physician, Dr. Evans, and he had expressed significant concern about Rusty. While the social workers knew Dr. Gooch was part of Rusty’s team, there is nothing in the record to indicate they should have known she was the primary physician. The note Morrison found in Rusty’s school records stating, “always talk with Dr. Gooch ... before taking mother’s word for anything” does not compel a different conclusion. Indeed, it seems to reinforce the suspicion that Mrs. Roska was not accurately reporting her son’s condition. The Majority also indicates that Morrison spoke to Dr. Gooch prior to the removal and should have indicated at that time that there was an emergency or that removal of Rusty was under consideration. However, whether Morrison actually spoke to Dr. Gooch prior to removal is not apparent from the record. It appears the initial return call from Dr. Gooch was a message *987 requesting Morrison make an appointment. Morrison then complied and received an appointment a week and a half later.[16]
Finally, the juvenile court’s ruling at the shelter hearing included a specific finding that, “[d]ue to the emergency situation which exists, the lack of preventive efforts by DCFS is reasonable.” (App. Vol. II at 615.) The Majority declines to consider the juvenile court shelter hearing in its reasonableness analysis for two reasons. First, the juvenile court relied on Utah Code Ann. § 78-3a-306(14), which allows a judge to order continued removal of a child regardless of any error in the initial removal. This is true. However, the Majority’s second contention — -the juvenile court did not consider the letter containing Dr. Gooch’s opinion that removal could harm Rusty because it was not a sworn statement — is not accurate.
The juvenile court judge read the letter from Dr. Gooch prior to hearing any testimony. Her opinion was referenced twice during Morrison’s cross-examination. Defense counsel also referred to Dr. Gooch’s opinion in both opening and closing arguments.[17] The record does not indicate that the judge discounted her letter, but nevertheless left Rusty in DCFS custody. In its Order continuing DCFS’ custody of Rusty, its specifically noted that “[t]he parties stipulated to the presentation of evidence and testimony by proffer, and the court heard the proffers and arguments of the parties.” (Id. at 613.) With essentially the same information as that, available to the social workers and with the luxury of an opportunity for cool and dispassionate reflection, the judge reached the same decision as did the social workers. That is an exacting measurement when the yard stick is reasonableness. The next day, defense counsel resubmitted the information contained in the letter in the form of an affidavit and added an allegation of emotional “irreparable harm” in support of his motion for a Temporary Restraining Order.
At the second hearing, defense counsel stated, “We’ve heard from Dr. Gooch twice now, we have a letter, we have her affidavit.” (Id. at 545.) He then pointed out that this was the only sworn testimony by any treating medical professional. After hearing argument, the juvenile court stated, “[T]he first exhibit we looked at, as you recall, was the doctor’s letter, it’s not a sworn statement, it’s not an affidavit under oath, it’s a letter. This is an affidavit under oath. This is legally a little differ *988 ent.” [18] (Id. at 552.) Thus, the court had substantially the same information at both hearings, but in a different legal context.
In addition, the juvenile court’s decision to return Rusty to his home was less than an about-face based on additional information. After noting the legal significance of the affidavit, it proceeded to discuss the evidence and its concerns regarding the competing risks of returning the child to his home and continuing the removal. Speaking specifically to both the parents and counsel, the juvenile court concluded:
So, now I’m balancing this risk even though I’ve stated in conclusory and in general terms and I wish there had been more specificity to whatever [irreparable] harm you’re talking about.... And that is missing. So, what I’m going to do is this. I’m going to send the child home on a temporary restraining order. Set a hearing ... and I ask the State to subpoena the doctor into court and she better appear or there will be a sheriff looking for her.... [T]here will be a caseworker assigned. I want close supervision. ... The Guardian Ad Litem is to have direct access to the child and if there are any concerns at all that are raised, the protective supervision worker has the authority under protective supervision to remove the child immediately if there is a physical problem and ... that’s in the good decision and discretion of the caseworker ... they can ... remove the child if there is any kind of problem at all. So this is very tenuous stuff here.
(Id. at 556-57.)
While the court’s ruling at the shelter hearing is not dispositive as it was based on a separate statute, it is a highly persuasive conclusion from one who had the opportunity to see and hear the witnesses. The relevance of its determination at the shelter hearing is not obviated by its ruling the next day.
There is no doubt that the competing interests in a case such as this are most sensitive.
“[P]rotective services caseworkers [must] choose between difficult alternatives .... If they err in interrupting parental custody, they may be accused of infringing the parents’ constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child’s rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.
Tenenbaum v. Williams, 193 F.3d 581, 596 (2d Cir.1999) (quoting van Emrik v. Chemung County Dep’t of mSoc. Svcs., 911 F.2d 863, 866 (2d Cir.1990) (footnote omitted)). See also Defore v. Premore, 86 F.3d 48, 50 (2d Cir.1996) (emphasizing the importance of the qualified immunity defense to ensure publicly employed caseworkers the necessary latitude to exercise their professional judgment in matters related to child welfare). However, “we must keep in mind that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.” Roska I, 328 F.3d at 1251 (citing, Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). See Phillips, 422 F.3d at 1080. “Where [social workers] of reasonable competence could disagree on the issue, immunity should be recognized.” Malley, 475 U.S. at 341, 106 S.Ct. 1092. We *989 should continue to recognize such protection essential if social workers are to adequately protect at risk children.
The totality of the circumstances leaves no doubt that reasonably competent social workers could disagree as to an appropriate response. Of particular moment were the urgent concerns of school personnel, nurses, health professionals, and doctors regarding Rusty’s deteriorating condition and suspected MSBP or medical neglect. Those concerns were coupled with the compelling medical and factual history supporting suspicions of MSBP and the family’s history of noncompliance with medical treatment plans. On such facts responsible decision makers could, consistent with § 62A-4a-202.1(2)(b), reasonably conclude that available preventive services were inadequate to protect Rusty from a toxic environment suspected of contributing to his seriously deteriorating condition. I would find qualified immunity applies to the facts of this case and therefore respectfully dissent from that part of the Majority opinion.

. "We must keep in mind that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.” Roska ex rel. Roska v. Peterson (Roska I), 328 F.3d 1230, 1251 (10th Cir.2003) (citing, Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

. In Roska I, we identified three prerequisites to the warrantless removal of a child from his home pursuant to § 62A-4a-202.1:
(1) the services caseworker must have "substantial cause to believe that any of the factors described in [§ ] 78-3a-301 exist”;
(2) there are no other "services reasonably available ... which, if provided to the minor’s parent or to the minor, would eliminate the need to remove the minor from the custody of his parent”; and (3) the services caseworker must be accompanied by a peace officer, unless one is not reasonably available.”
328 F.3d at 1253 n. 31 (quoting Utah Code Ann. § 62A-4a-202.1 (1998)).

.Since Rusty’s removal, § 62A-4a-202.1 has been amended several times. In relevant part, it now provides that a child welfare worker may not remove a minor from the minor’s home unless the child welfare worker has (1) received the consent of the minor’s parent or guardian, (2) obtained a court order or (3) exigent circumstances exist. Utah Code Ann. § 62A-4a-202.1(l)(a), (b). However, at the time of Rusty's removal, the statute did not require exigent circumstances.

. FDP is the diagnostic label provided by the Diagnostic and Statistical Manual of Mental Disorders, DSM-IV (APA, 1994). Lynne Holland Goldman & Beatrice Crofts Yorker, Mommie Dearest? Prosecuting Cases of Mun-chausen Syndrome by Proxy, 13-WTR Crim. Just. 26, 27 (Winter 1999). Ms. Morrison included a complete report on the syndrome in the case file.

. Facts regarding MSBP can be found in the record at Appendix Volume II, pages 476-84.

. Patricia Maynor, the school nurse, related the last time she saw Rusty, "[h]e was huddled in 70 degree weather with a heavy winter coat on and was sweating profusely, was very pale and clammy and it looked like he was in a lot of pain.” (App. Vol. II at 216.) Mrs. Roska told her Rusty was in kidney failure. Previously, Mrs. Roska had told Nurse Maynor Rusty had parasites in his liver, had been in liver failure, and was suffering from intestinal parasites. Nurse Maynor testified "I had seen a real deterioration in his physical being, his physical well-being. I was very concerned.” (Id. at 217.) Cheryl Wilson, Rusty’s sixth grade and home-school teacher stated, "By the end of the school year, Rusty’s condition never improved, he was getting thinner and weaker. I believed something needed to be done or Rusty was in danger of dying.... I was concerned that Rusty was not getting the medical attention he was in need of.” (Id. at 366.) Heather Sather, the coordinator of special services at the school stated, “I was alarmed at the child’s deterioration.” (Id. at 568.) Ms. Sneddon testified the school officials
told me that they had known this family for almost two years and that they had been keeping a file.... They told me that they felt if DFS didn’t step in and remove this child from the home that this child would never see seventh grade.... They were afraid, because they were afraid over the summer he would die.... They were telling me that every day he looked worse and worse, that he looked pale, that he was losing weight, he was able to do less and less for himself, and they were very concerned for his health and safety.
(Id. at 347.)

. Dr. Bursch did not do a full-blown investigation of MSBP, but the family was watched' carefully while they were at UCLA. While Rusty was treated as an in-patient (a close and structured environment), the family did not exhibit any evidence of MSBP.

. As reported in the DCFS investigative files, Dr. Joseph stated, "he has wondered when someone would figure out what is going on.... [H]e is not sure if [Mother] is actively making [Rusty] sick, but she is surely involved passively. He thinks [Mother] is very 'Mun-choid.' He said [Mother] will take [Rusty] to the doctors but fails to comply with treatment suggestions." (App. Vol. II at 607.) Dr. Evans "wanted to know who finally realized what was going on and referred this case.... Dr. Evans said he has been concerned for some time.... Dr. Evans feels the parents are not following through with recommended treatment for [Rusty].” (Id. at 608.)

. After Rusty’s removal and return home, he achieved substantial rehabilitation within a month under constant supervision by DCFS. By the end of June 1999, Rusty had started trying food and was walking with a walker. By September 1999, Rusty was walking with a cane, eating on his own, gaining weight and attending school. By January 2000, Rusty was walking normally, attending school, eating and continuing to gain weight. Contrary to the Majority’s assertion, Rusty's success under DCFS supervision does not undermine the reasonableness of the social workers' decision to forego preventive services prior to removal. Compliance with DCFS was not voluntaiy, but ordered by the juvenile court. Moreover, 20/20 hindsight does not change the analysis. The social workers’ response is required to be reasonable under the circumstances, not clairvoyant.

.Prior to the removal, the social workers believed Dr. Evans was the primaiy treating physician because he was listed on Rusty's school records as his pediatrician. He was also listed as Rusty’s pediatrician on the Dis *983 charge Plan from UCLA, while Dr. Gooch was listed as a physical medicine specialist. It was only during Ms. Morrison's interview with Mrs. Roska at the home just prior to the telephone call from Dr. Gooch that Mrs. Ros-ka told Ms. Morrison that Rusty’s primary physicians were Dr. Gooch and Dr. Seigler. Mrs. Roska explained Dr. Evans was listed as the primary doctor, “but he just refers them out, because [Rusty's] medical condition is 'beyond him.' " (App. Vol. II at 608.)

. Although the Majority discounts this fact, finding the evidence "shaky,” it is not contested. Moreover, I fail to understand why the Majority does not find it surprising that a parent under DCFS investigation would not be cooperative.

. While Ms. Morrison was interviewing Rusty's sister, Maria (soon to graduate from high school), prior to telling Mrs. Roska Rusty would be removed, she offered Maria a support person. Maria declined. At the same time, Ms. Sneddon interviewed Rusty and offered him a support person. He also declined.

. This quote comes from the notes of Ms. Sneddon. When asked about the conversation, Dr. Gooch testified she stated, "it would be harmful, it would be bad for them, it would be bad for Rusty, bad for his family to remove him from the home.” (App. Vol. Ill at 686.)

. The Majority overstates the consequence of this observation. This is not to say that Dr. Gooch was, in fact, being manipulated by Mrs. Roska and had "bought into” the suspected abuse because she disagreed with removal. Neither does this comment allow social work professionals to "ignore the opinion of any doctor who believes removal may harm the child.” Rather, the question is whether it was reasonable for the social workers to proceed with removal without discussing preventive services at that point. Given the concerns of at least five medical persons (nurses and doctors) and Dr. Gooch’s refusal to confirm or deny MSBP at that time, the social workers’ decision to forego an immediate initiation of discussions regarding possible preventive services was reasonable.

. The law does not require the social workers' reasonable and well-supported suspicions to be ultimately confirmed. It requires their professional judgments to be reasonable.

. Morrison stated in her deposition, "I was still kicking around the fact that I had not talked to Dr. Gooch. I couldn't get hold of her. I actually called her office and she told me curtly that she did not have the time to talk to me at the moment, that it was a complicated case, and that I needed to make an appointment to see her.” (App. Vol. II at 414-15.) However, it appears that this reference was to the message she received in response to her call since there is no other discussion of an in-person telephone call with Dr. Gooch prior to removal.

. The Majority chastises Ms. Morrison for not mentioning at the original shelter hearing that they received the telephone call from Dr. Gooch during the removal process. However, Ms. Morrison was not asked -about the telephone call during either direct or cross examination. The inquiry from the plaintiff's attorney, the defense attorney and the guardian ad litem was limited solely to her own conversations and did not mention Dr. Gooch's opinion or her reaction to it. The only questions regarding Dr. Gooch was posed by defense counsel when he asked "Dr. Gooch doesn't beliéve he’ll die if he’s in the home, does she?” and when answered in the negative, his follow-up question, "Whose more qualified to make that decision, Dr. Gooch or the school nurse ... ?” (App. Vol. II at 254.) If any person were responsible for "gamesmanship” at the hearing, it was not the social workers.

. Unfortunately, the record does not include Dr. Gooch's letter or her affidavit presented to the state court at the two hearings. Like the Majority, I can only surmise the contents from the arguments of counsel.